UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA   )   | |
|                                                       )   | |
|             vs.                                     )   | CAUSE  No.  3:05-CR-101(01)RM |
|                                                       )   | |
| DORIAN L. HARRIS                   )   | |

OPINION AND ORDER

Around 3:00 in the afternoon of March 19, 2005, South Bend Police Corporal Alan Delinski was on patrol in uniform and in a marked police car, traveling southbound on Sherman St. near the 700 block. Corporal Delinski, a 10-year veteran with his department, was assigned to the department's Neighborhood Enforcement Service Team, a community-oriented policing effort. Corporal Delinski's supervisor had directed the team to focus their patrol efforts in the city's northwest quadrant because of citizen complaints of prostitution, open air drug dealing, and burglaries.

Corporal Delinski saw Dorian Harris walking north on the east sidewalk. Mr. Harris looked at Corporal Delinski for a time period much longer than Corporal Delinski has found to be typical. Mr. Harris immediately veered from the sidewalk into a very muddy yard rather than continue to a walkway slightly further north that led to the front door of the residence at 724 N. Sherman. Mr. Harris glanced at the house, then resumed looking at Corporal Delinski until he reached the front door of 724 N. Sherman.

Corporal Delinski saw Mr. Harris engage in a knocking motion with his right fist, not actually contacting the door, while still looking at Corporal Delinski in his

marked police car. Mr. Harris's left hand was in his jacket pocket. Corporal Delinski's window was open and his radio was off, so he would have heard knocking. Corporal Delinski passed Mr. Harris, made a u-turn, stopped his marked car in front of 724 N. Sherman, got out of the car, and began to walk toward Mr. Harris. Mr. Harris knocked on the front door with audible results, left hand still in his pocket.

In Corporal Delinski's experience, drug dealers keep their hands in their pockets when carrying drugs or weapons. Corporal Delinksi asked Mr. Harris if he knew who lived in the residence; Mr. Harris responded that his baby's momma lived there, but Mr. Harris didn't give a name. Corporal Delinski asked Mr. Harris to step off of the porch, which was elevated 12-16" above ground level. Mr. Harris slowly turned, took a couple of steps, and jumped off the porch toward Corporal Delinski with his left hand still in his pocket.

Concerned for his own safety in light of Mr. Harris's behavior and the information on the team's hot line about open-air drug dealing and burglary, Corporal Delinski conducted a patdown search of Mr. Harris for weapons. He found two full soda cans in Mr. Harris's pockets, and set them on the porch. Corporal Delinski then felt several small cylindrical items in Mr. Harris's right front jacket pocket. Thinking them to be bullets, Corporal Delinski removed the objects and found 22 live .22 caliber rounds, which Corporal Delinksi placed in his own pocket.

2

At some point during the pat-down, a woman opened the residence door and asked what was going on. Corporal Delinski said he would answer her questions when he was done with the patdown. When the patdown was complete, the woman came out again and addressed Mr. Harris by his first name. Corporal Delinski asked her to go back inside, and she did. Corporal Delinski asked Mr. Harris if he had ever been arrested; Mr. Harris said he had. Corporal Delinski asked Harris if he had any felony convictions; Mr. Harris said he did, and added that he was out on bond on a felony charge.

Corporal Delinski telephoned an ATF agent and learned that federal law made it illegal for a convicted felon to possess ammunition. Corporal Delinski then kept the ammunition and, not being a federal agent, told Mr. Harris that he was free to go. Mr. Harris seeks suppression of the ammunition, claiming its seizure violated the Fourth Amendment to the United States Constitution.

The Fourth Amendment bars unreasonable searches and seizures, but allows a law enforcement officer to conduct a brief investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot. Illinois v. Wardlow, 528 U.S. 119 (2000) (*citing* Terry v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868 (1968)). The Constitution permits a brief investigatory stop that demands only a limited intrusion into an individual's privacy when the intrusion is based upon "specific and articulable facts which, when taken together with rational inferences from those facts reasonably warrant that intrusion." United States v. Baskin, 401 F.3d 788, 791 (7th Cir. 2005) (*quoting* Terry v. Ohio, 392

3

U.S. at 21). The officer must be shown to have had "a reasonable, articulable suspicion that criminal activity may be afoot." Marshall v. Teske, 284 F.3d 765, 771 (7th Cir. 2002). A reasonable, articulable suspicion consists of at least a minimal level of objective justification for making the stop, Illinois v. Wardlow, 528 U.S. at 123, so before making a Terry stop, the officer must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity. Id. at 123-124.

A court deciding whether reasonable suspicion existed examines the totality of the circumstances known to the officer at the time of the stop, the suspect's behavior and characteristics, and the officer's experience. Leaf v. Shelnutt, 400 F.3d 1070, 1091 (7th Cir. 2005); United States v. Lenoir, 318 F.3d 725, 729 (7th Cir. 2003). Flight upon seeing the police approach in a high crime area may establish reasonable suspicion to justify a Terry stop. United States v. Lenoir, 318 F.3d at 729 (*citing* Illinois v. Wardlow, 528 U.S. 119, 124 (2000)). Wholly innocent characteristics may, taken together, amount to reasonable suspicion. Leaf v. Shelnutt, 400 F.3d 1070, 1091 (7th Cir. 2005); *see* Reid v. Georgia, 448 U.S. 438, 441 (1980).

The facts surrounding the discovery of the ammunition in Mr. Harris's jacket pocket easily satisfy these standards. Corporal Delinski brought ten years of experience to the afternoon's events. Working in an area that had produced complaints of open-air drug dealing and burglaries, Corporal Delinski watched Mr. Harris walk through a very muddy yard to reach a door that could have been

4

reached by sidewalk, watching the marked police car until he reached the door. Mr. Harris then broke eye contact with the police car only long enough to glance at the house; while continuing to watch the police car, Mr. Harris went through the motions of knocking on the door. When Corporal Delinski approached, Mr. Harris made knocking sounds as well as motions, with his left hand in his jacket throughout despite temperature that were warmer than normal.

Mr. Harris argues that the court should discount the importance of his having looked at the officer and the car for an inordinate time, citing United States v. Broomfield, 417 F.3d 654, 655 (7th Cir. 2005), in which the court of appeals said,

> Gilding the lily, the officer testified that he was additionally suspicious because when he drove by Broomfield in his squad car before turning around and getting out and accosting him he noticed that Broomfield was "star[ing] straight ahead." Had Broomfield instead glanced around him, the officer would doubtless have testified that Broomfield seemed nervous or, the preferred term because of its vagueness, "furtive." Whether you stand still or move, drive above, below, or at the speed limit, you will be described by the police as acting suspiciously should they wish to stop or arrest you. Such subjective, promiscuous appeals to an ineffable intuition should not be credited.

The court doesn't read that passage as forbidding any consideration of a suspect's eye movements; such a reading effectively would exclude a circumstance from the totality of circumstances courts are to consider. The Broomfield court was cautioning courts not to place undue emphasis on such things: neither looking at a police officer nor ignoring her, without more, warrants an investigatory stop.

5

Mr. Harris's watching of the squad car doesn't stand alone. Mr. Harris also took what could be seen as a curious route to a door that may or may not have been his original destination (given the inconsistency between a pantomime knock and a desire for admission). That conduct takes Corporal Delinski's observation of the fixedness of Mr. Harris's gaze out of the realm of ineffable intuition.

The government deems important that when asked, Mr. Harris didn't give the occupant's name (as distinct from a descriptive phrase that couldn't be verified by police radio). Corporal Delinski wasn't asked whether such an answer was unusual in light of his experience as a law enforcement agent, so the court declines to follow the government on this aspect of its reasoning. Still, even if Mr. Harris's answer didn't add to suspicion, neither did it provide the sort of information that would temper the suspicion emanating from other factors.

Finally, when asked to step down from the porch, Mr. Harris kept his hand in his left pocket as he jumped off a porch more than a foot above the ground.

All of these things combined to give rise to a reasonable, articulable suspicion (though certainly not probable cause to believe) that Mr. Harris had engaged in, or was about to engage in, criminal activity, justifying a brief and limited intrusion to inquire into his purposes in the area. Given the steady presence of Mr. Harris's hand in his left pocket even when jumping from the porch, concern for his own safety warranted a limited patdown for weapons.

The government's case against suppression would have been considerably weaker had the resident referred to Mr. Harris by name before the patdown was

6

completed, but a court determining the permissibility of a <u>Terry</u> seizure may not consider facts not discovered until after the seizure.

Corporal Delinski did not exceed the scope of what the constitution allowed him to do. He made a brief stop accompanied by a limited intrusion consisting of a patdown for weapons. Once that patdown was completed, Corporal Delinski engaged in a very brief investigation into the propriety of returning the ammunition to Mr. Harris, then let Mr. Harris go, albeit without his ammunition.

The court DENIES the defendant's motion to suppress [docket #13].

SO ORDERED.

ENTERED:   November 29, 2005

/s/ Robert L. Miller, Jr.
Chief Judge
United States District Court

cc:   D. Harris
      R. Truitt
      D. Schmid